1    `

2

3

4

5

6

7

8                    # UNITED STATES DISTRICT COURT

9                        ### EASTERN DISTRICT OF CALIFORNIA

10

11   JAIME ALEJANDRO MARTINEZ          Case No. 1:12-cv-01706-AWI-SAB (HC)
     LOPEZ,
12                                     FINDINGS AND RECOMMENDATION
                     Petitioner,      REGARDING PETITION FOR WRIT OF
13                                     HABEAS CORPUS
           v.
14                                     (ECF No. 1)
     CONNIE GIPSON,
15
                     Respondent.
16

17
           Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28
18
     U.S.C. § 2254.
19                                          **I.**

20                                 **RELEVANT HISTORY**

21         Following a jury trial in the Fresno County Superior Court, Petitioner was convicted of

22   count 1, first degree murder (Cal. Penal Code[1] § 187, subd. (a)), with the special circumstance

23   that the murder was committed for financial gain (§ 190.2, subd. (a)(1), and it was found true that

24   Petitioner personally discharged a firearm proximately causing death (§ 12022.53, subd. (d)); and

25   count II, arson (§ 451, subd. (d)).

26   ///

27

28   [1] All further statutory references will be to the California Penal Code unless otherwise indicated.

Petitioner was sentenced to life without the possibility of parole, plus 25 years to life for the firearm enhancement.

Petitioner filed a timely notice of appeal.  On March 28, 2011, the California Court of Appeal, Fifth Appellate District, affirmed the judgment.

On April 11, 2011, Petitioner filed a petition for review in the California Supreme Court. The petition was summarily denied on July 13, 2011.

Petitioner filed the instant petition for writ of habeas corpus on October 17, 2012. Respondent filed an answer to the petition on January 25, 2013, and Petitioner filed a traverse on February 28, 2013.

**II.**

**STATEMENT OF FACTS**

A few months before October 2008, [Petitioner] bought a Mitsubishi truck from Gallegos. [Petitioner] picked up the truck at Gallego's house in Kerman.  Gallego's wife knew [Petitioner] by the nickname of "Tornillo."

[Petitioner] failed to make timely payments on the truck.  Gallegos learned from his friend, Rodrigo Torres, that other people were driving the truck around the San Joaquin area.  Gallegos decided to take the truck away from [Petitioner].

About one week before Gallego's death, Torres drove Gallegos to San Joaquin so he could take back the Mitsubishi truck.  Gallegos and Torres found the truck with someone other than [Petitioner].  Gallegos reclaimed the truck and drove it back to his house in Kerman.

Gallego's wife testified about an incident which happened on the day that Gallegos reclaimed the Mitsubishi truck.  [Petitioner] arrived at their Kerman residence with two other people, and he was carrying a "car amplifier."  [Petitioner] asked Gallegos for the truck back.  Gallegos asked [Petitioner] when he was going to bring the money, because [Petitioner] owed him $2,500 to $3,000 for the truck.  [Petitioner] replied he did not have the money, but he was going to borrow it.  Gallegos was skeptical that [Petitioner] could get the money since [Petitioner] failed to pay him for several months.  [Petitioner] told Gallegos that was his own problem, and he would get the money.  [Petitioner] asked Gallegos to give him until October 19, 2008, to get the money.  Gallegos agreed and gave the truck back to [Petitioner], and [Petitioner] drove away in the Mitsubishi.

***Gallegos leaves to meet [Petitioner]***

On the afternoon of October 19, 2008, Gallegos took his wife and children to eat at McDonald's in Kerman.  Around 5:30 p.m., Gallegos stepped outside the restaurant and made a short call.  According to Gallego's wife, Gallegos had arranged to meet

2

[Petitioner].  Gallego's wife asked him if he wanted her to accompany him.  Gallegos said no.  Gallegos dropped off his wife and children at a relative's house.  Gallegos drove away in his burgundy Dodge Durango SUV, and his family never saw him again.

Testimony of Armando "Changa" Ayala

Armando Vasquez Ayala, also known as "Changa," was 16 years old and knew [Petitioner] and his family.  Ayala testified that around 5:00 p.m. on October 19, 2008, he called [Petitioner] for a ride because he needed to speak to his work foreman.  [Petitioner] picked him up between 5:00 p.m. and 6:00 p.m.  [Petitioner] was not driving the Mitsubishi truck, but instead was driving a car that Ayala thought belonged to [Petitioner's] cousin, known as "Cigarin."

Ayala testified that [Petitioner] gave him $20, and told him to put gas in the car and buy a lighter.  [Petitioner] told Ayala to drop him at a certain location, and then drive the car to a particular vineyard off Lincoln Avenue in Kerman.  [Petitioner] told Ayala to wait for him in that vineyard and put on the car's emergency lights.  [Petitioner] said he would arrive in another vehicle and pull into the field.  He told Ayala to go "in front" or "behind" the other vehicle and follow him into the field.  Ayala agreed.

Ayala followed [Petitioner's] instructions and dropped him off at "Tijuanitas" in Kerman.  [Petitioner] was dressed in black, including a black jacket and black gloves.  Around 6:00 p.m. or 7:00 p.m., Ayala drove a car [Petitioner] had been driving to the designated vineyard, parked just off Lincoln Avenue, turned on the emergency lights, and waited.  Ayala admitted that based on [Petitioner's] statements and request for a lighter, he thought [Petitioner] and another person were going to burn a stolen car, or burn a car that belonged to someone that they did not like.

Ayala testified that he watched his rearview mirror and saw a grey or dark-colored truck arrive in the area.  The truck made a fast turn, almost overturned, corrected at the last moment, and turned on the dirt road that led into the vineyard.  Ayala thought [Petitioner] and another person were in the truck.  Ayala did not see any other cars in the area.

Ayala intended to drive into the field and follow [Petitioner], but he could not start [Petitioner's] car.  Ayala tried to start the car for 15 or 20 minutes, but he gave up and walked into the field.  Ayala found [Petitioner] walking on a dirt road between the grape vines.  Ayala did not see the truck after it pulled into the field, but he saw lots of black smoke rising from the vineyard.

[Petitioner] asked Ayala what happened to the car that [Petitioner] gave him.  Ayala explained the car would not start.  They walked back to the car and [Petitioner] tried to start it.  [Petitioner] began swearing and appeared "desperate" and "anxious" because the car would not start.

///

///

3

1

2

3

4

Ayala asked [Petitioner] whether the other person, who had arrived in the truck with [Petitioner] could call for help.  [Petitioner] referred to the other person as "buey," said he was "over there," and told Ayala not to talk about that person.[2]  Ayala thought [Petitioner] meant the other person was "hiding."

5

6

7

8

Ayala testified that [Petitioner] called his cousin Freddie, known as "Cigarin," to help them start the car.  Freddie arrived and started [Petitioner's] car with jumper cables, and then left.  Ayala entered the newly-started car and stepped into the back seat, because he expected the "other guy" would join them.  [Petitioner] got in the driver's seat and told Ayala to get in the front seat.  Ayala asked if they were going to pick up the other guy, and [Petitioner] said no.

9

10

11

12

As [Petitioner] drove Ayala back to his house, [Petitioner] told Ayala that he shot "the other guy" and the victim was "burning up."  [Petitioner] said the victim had been driving the truck, [Petitioner] shot him in the head, the truck almost flipped over, and [Petitioner] managed to get into the driver's seat and take control of the truck.  [Petitioner] said he put the gun to the victim's head, the victim said to go ahead and shoot, and [Petitioner] shot him.

13

14

15

16

Ayala asked [Petitioner] why he shot the other man, and [Petitioner] said "they had problems, trouble between them," and the victim had "shit on his stick too much." [Petitioner] said the victim's name was "Botella," and called him a "son of a bitch." [Petitioner] said he had to burn his own jacket because the victim had "smeared" it with blood.  [Petitioner] told Ayala not to tell anyone about what happened, but added that Ayala would hear people talking about someone who got burned.

17

18

Ayala testified [Petitioner] was not wearing a black jacket when they met in the field. Ayala did not see [Petitioner] get rid of the jacket and he did not see any blood on [Petitioner].

19

20

However, Ayala noticed that [Petitioner] stripped off his gloves and threw them in the field before they drove away.

21

22

Ayala testified he became frightened when defendant told him about shooting and burning the victim.  Ayala did not see [Petitioner] with a gun, and he did not ask to see a gun because he was scared.

23

24

. . .

25

///

26

27

28

---

[2] Detective Palma testified that the literal translation for "buey" was "an oxen that has been castrated."   The term is commonly used either as a friendly or derogatory substitute for "dude."

**DEFENDANT'S PREARREST INTERVIEW**

The detectives learned from Gallego's family that he was supposed to meet "Tornillo" about the Mitsubishi truck when he disappeared.   They also learned that Torres knew about Gallegos's transaction with "Tornillo."

On the afternoon of October 20, 2008, Detectives Palma and Toscano met Torres and his wife at the sheriff's substation in San Joaquin.  The detectives drove them around the area, and the Torres's showed the various locations where they had seen the Mitsubishi over the past few weeks.  As the detectives returned Torres and his wife to the substation, they saw the Mitsubishi traveling on Manning Avenue.  The Mitsubishi was being followed by a Dodge sedan and a Chevrolet pickup truck.

The detectives followed the Mitsubishi and the two other vehicles to an apartment and conducted traffic stops.  [Petitioner] was driving the Chevrolet pickup truck, and his father, Martin Tovar Martinez, was driving the Mitsubishi.  The detectives, who were in civilian clothes, spoke to [Petitioner] and described him as calm.  Detective Palma asked [Petitioner] if he was "Tornillo" and [Petitioner] said yes.  Palma asked [Petitioner] if he would accompany them to the nearby substation in San Joaquin and answer questions.  [Petitioner] agreed, and the officers drove him to the substation.

**First phase of the interview**

Detectives Palma and Toscano interviewed [Petitioner] at the sheriff's department substation in San Joaquin.  They conducted the interview in Spanish and it was tape-recorded.  The interview was conducted in two parts separated by a break.

At 8:05 p.m. Detectives Palma and Toscano started the first part of the prearrest interview with [Petitioner].  Palma assured [Petitioner] that he was not under arrest, he could ask for a break or something to drink, he could end the interview at any time, and all he had to do was ask.  [Petitioner] was calm and said okay.

[Petitioner] confirmed he recently bought the Mitsubishi truck from "Jose," also known as "Botella."  The detectives later confirmed that "Botella" was Gallegos.  [Petitioner] said he went with Gallegos to the Department of Motor Vehicles (DMV) in Madera and they put his name on the truck.  [Petitioner] said this occurred around 5:00 p.m. or 6:00 p.m. on October 19, 2008.

[Petitioner] said he bought the truck from Gallegos about three months earlier, with an agreed price of $3,000.   [Petitioner] made a down payment of $850 and Gallegos agreed to accept payments because [Petitioner] did not have the cash.  Gallegos told [Petitioner] to pay off the truck in two months, and [Petitioner] agreed to make weekly payments of $200.

[Petitioner] said the truck started to break down, and he reduced his weekly payments to $100 and used the rest of the money to fix the truck.  Gallegos initially agreed to the reduced payments, but Gallegos started "'fighting with his woman'" and demanded more money from [Petitioner].

5

[Petitioner] said he met Gallegos at 5:00 p.m. on October 19, 2008. [Petitioner] gave him $2,400 as the final payment on the truck, and Gallegos gave him the pink slip. Gallegos drove [Petitioner] back to his house and they passed "Bocho," one of Gallegos's friends. [Petitioner] said that both Gallegos and Bocho used and sold crystal methamphetamine. Gallegos picked up Bocho and they talked about getting some crystal. [Petitioner] said Gallegos dropped him off at his house between 6:30 p.m. and 7:30 p.m. and drove away with Bocho.

Throughout the interview, [Petitioner] gave inconsistent statements as to when Gallegos gave him the truck's pink slip and when they went to the DMW: that Gallegos gave him the registration papers and kept the pink slip when [Petitioner] made the down payment; Gallegos gave him the pink slip and they went to the DMV when [Petitioner] made the down payment; and/or Gallegos gave him the pink slip and they went to the DMV on the afternoon of October 19, 2008, when [Petitioner] made the final payment.

Detective Palma asked [Petitioner] about his interactions with Ayala. [Petitioner] said he drove a white Chevrolet pickup truck to Ayala's house, left the truck there, and walked to a particular location where Gallegos picked him up. Palma asked [Petitioner] why he left his truck at Ayala's house, met Gallegos on foot, and let Gallegos drive him back to his own house. [Petitioner] chuckled and said he was "fatigued" and "nauseated" and did not have any energy.

Detective Palma testified [Petitioner's] demeanor changed as the interview continued. [Petitioner] repeatedly paused, looked down, and avoided eye contact when the officers asked more questions about Gallegos.

**Second phase of the interview**

At 9:45 p.m., the detectives told [Petitioner] they were going to take a break, and they walked with him to the front of the substation. [Petitioner] stayed outside and by himself during the break, and he did not try to leave.

At 10:15 p.m., the detectives contacted [Petitioner] outside the substation to resume the interview. Palma was surprised he was still there. [Petitioner] did not have any objections to continuing the interview and he went back inside. Palma testified that if [Petitioner] had left during the break, they would not have pursued or arrested him, but they would have continued the investigation.

When the interview resumed, Detective Palma asked [Petitioner] about the location of the truck's pink slip. [Petitioner] said it was in the truck's glove box, and gave permission for an officer to retrieve the document from the truck. [3]

---

[3] An officer responded to the location where the Mitsubishi truck was parked, found the pink slip in the vehicle's glove box, and brought it back to the substation. At trial, Gallegos's wife identified Gallegos's signature on the front of the pink slip. The name "Alejandro Martinez" was signed on the back in different handwriting.

6

Detective Palma testified that he used the second half of the interview to confront [Petitioner] about discrepancies in his prior statements.  Palma told [Petitioner] that he had to explain if someone got him into this mess, and asked what happened to Gallegos. [Petitioner] said he did not know what happened and thought Gallegos was with his family.  Palma asked [Petitioner] if he was afraid of anyone, and [Petitioner] said no.

Palma testified that [Petitioner's] demeanor changed during the second half of the interview.  [Petitioner] looked away from the officers, and he acted worried and evasive. Palma encouraged [Petitioner] to tell the truth and explain the situation.  [Petitioner] said he did not know what happened.  Palma told [Petitioner] he was lying and covering up because Gallegos was dead.  [Petitioner] said he had nothing to with it.  Palma said [Petitioner] looked like he was guilty and he knew what happened.  [Petitioner] said he had nothing to do with it.  Palma said [Petitioner] looked like he was guilty and he knew what happened.  [Petitioner] said he did not know.

Palma again advised [Petitioner] that he was not under arrest.  He asked [Petitioner] if he was finished or if he was going to tell the truth.  [Petitioner] said he did not have anything to say.  Palma asked [Petitioner] if he was going to wait and see what the officers were going to do.  [Petitioner] laughed in response.

Palma repeatedly challenged [Petitioner's] story about Ayala's existence.  [Petitioner] initially refused to identify where Ayala lived, but eventually agreed to point out his house.

The interview ended at 11:10 p.m. on October 20, 2008.  The officers drove [Petitioner] home and he pointed out Ayala's residence in San Joaquin.

**THE INVESTIGATION CONTINUES**

On October 21, 2008, Detective Palma interviewed Ayala about [Petitioner] and Gallegos. Ayala testified that he initially lied to Palma about his knowledge of [Petitioner's] actions because he was afraid that he would get in trouble for going to the field to "help out" [Petitioner].

Ayala eventually told the detectives about [Petitioner's] activities in the field, and that [Petitioner] admitted that he killed Gallegos and burned the vehicle.  Based on Ayala's statements, the detectives decided to arrest [Petitioner].

. . .

***First phase of the postarrest interview***

At 1:25 a.m. on October 22, 2008, Detectives Palma and Toscano moved [Petitioner] from the holding cell to an interview room, and started their interview with [Petitioner]. As he started the interview, Detective Palma advised [Petitioner] that he was under arrest and Palma was going to read his rights to him.  Palma also told [Petitioner] it was

important for him to tell the truth now and explain what happened. [4]
According to the interview transcript, Palma told [Petitioner] the following:

"[Palma]: It's important for you to be honest and tell the truth.  We've already had an interview before today, okay, and you told us—part of what you told was true, but there is more lacking.  It's important for you to show remorse about what happened and explain exactly how things happened.  And if you have an explanation about why what happened, happened, if you were provoked or if it was in self-defense or anything like that, it is important for you to tell us now, okay?  I'm going to read you your Rights, if you have any question… if you don't understand any of these Rights, I will explain it to you.

"A.  Yes."[5]  (Italics added.)

 After Palma made these statements, he advised [Petitioner] of the warnings pursuant to *Miranda*.  [Petitioner] said he understood his rights and started to answer questions.

Palma testified [Petitioner] was "evasive" when the interview began.  [Petitioner] did not give "fast and fluid" responses, he took some time to respond, and he appeared to think carefully before he answered.  [Petitioner] sat with his arms crossed, and "his forehead resting on his arms."  [Petitioner] appeared "worried, thinking, head down," and he would "pick up his head at times, look that way, not face us."[6]

Palma told [Petitioner] it was better for him to tell what happened, express remorse now, and explain his reasons.  Palma asked [Petitioner] if he killed Gallegos and burned the car.  [Petitioner] said no.  [Petitioner] said someone named "Reyes Mata Palomino" killed Gallegos and burned the car.  [Petitioner] said Reyes asked him to "herd" Gallegos to a certain location where Reyes was going to beat him up.  [Petitioner] said Gallegos owed Reyes some drug money.

[Petitioner] said that Ayala was with him because they were going to see their work foreman.  [Petitioner] told Ayala to get another car and wait for him by the fields where they worked on Lincoln Avenue.

Detective Palma asked [Petitioner] if he had the money to pay off the truck.  [Petitioner] initially said yes, and then said no.  [Petitioner] said Gallegos pestered him about paying

///

---

[4] At trial, Palma explained his basic strategy when he interviews a homicide suspect: "I want to hear what happened. I want to hear the motive why what happened happened.  If there is anybody else involved, I want to hear about it.  I want to hear the reason why that happened."  In homicide investigations, Palma tells a suspect "that I want to know the truth," and that it was in the suspect's best interests "to tell us his side of the story as to how things happen and why things came about."  "We tell them that to tell us the truth as to what happened.  That's what we tell them."

[5] In section I, *post*, we will address [Petitioner's] contentions that Palma's preliminary statements nullified the subsequent Miranda advisements, and rendered his postarrest statements involuntary and inadmissible.

[6] Detective Palma conceded he did not ask [Petitioner] how long he had been awake that day or whether he was tired. Palma testified [Petitioner] did not appear to be tired.

8

off the truck and making the payments.  [Petitioner] was angry because Gallegos yelled and insulted him, and called him a "snot-nosed kid."  [Petitioner] said that Reyes told him not to pay Gallegos for the truck.

[Petitioner] said he was in Gallego's Durango SUV, and Reyes followed them in a Chevrolet Tahoe as they headed to Lincoln Avenue.  [Petitioner] got Gallegos to stop in the field by telling him that he had to urinate.  [Petitioner] said Reyes and others talked to Gallegos at the entrance into the field before they drove onto the dirt road.  [Petitioner] said Reyes got into the back seat of the Durango.  [Petitioner] also said Reyes got out of the Durango, pulled a revolver, and pointed it at Gallegos's head.  [Petitioner] said he got out of the Durango and stood behind Reyes.  Reyes shot Gallegos point-blank into the forehead.

[Petitioner] said that after Reyes shot Gallegos, [Petitioner] went to the car where Ayala was waiting.  The car did not start because the battery was dead.  [Petitioner's] cousin arrived at the field to jump-start the battery.  [Petitioner] said he told Ayala not to talk about what happened because he was afraid.

Detective Palma asked [Petitioner] about Ayala's statement, that the Durango almost flipped over before it pulled into the field.  [Petitioner] paused when he heard this question, and then said that he argued with Gallegos about the truck and Gallegos was not looking at the road.  Palma asked [Petitioner] why he told Ayala that he shot Gallegos.  [Petitioner] denied making that statement to Ayala.

Palma asked [Petitioner] why he failed to mention anything about Reyes during their first interview.  [Petitioner] started crying and said he was afraid of "those guys" because they could "'do something'" to his family.  Palma repeatedly suggested to [Petitioner] that Reyes did not exist.  [Petitioner] replied that Reyes existed and lived in Madera.  Palma asked [Petitioner] how Reyes and his friends knew [Petitioner] was supposed to meet Gallegos that day.  [Petitioner] did not respond.  Palma falsely told [Petitioner] that he had shoe prints at the crime scene, and [Petitioner] did not respond.[7]

Palma again asked [Petitioner] why he told Ayala that he had killed Gallegos.  [Petitioner] finally admitted he made the statement, but claimed he was "'boasting'" so he could feel "'more important than them.'"  [Petitioner] said he had the money to pay Gallegos for the truck, but Reyes told him not to pay Gallegos.

Throughout the first part of this interview, the detectives urged [Petitioner] to tell them the truth, to pick up his head and talk like a man, that no one would believe his story, and he should consider how other people would think about him.  The detectives told [Petitioner] that it was better to tell the truth, explain everything, and show remorse for what happened.  [Petitioner] kept saying that he was telling the truth.

---

[7] Palma testified that he did not find any shoe prints around the crime scene but he used deception as an interview technique.

9

Palma told [Petitioner] the "'game'" was over, and it would be good for him to show that he had a heart and felt bad about what happened, and he left a family without a husband and father.  Palma asked [Petitioner] what his own child would think of his behavior.  [Petitioner] did not answer.

Palma asked [Petitioner] what provoked him to kill Gallegos.  [Petitioner] said he did not take Gallegos to the field  "'so they could kill him.  I just took him there so they could beat him up.'"  How many times do you want me to tell you that I didn't kill him?'"

### The second phase of the postarrest interview

Around 3:00 a.m., the detectives took a break and escorted [Petitioner] from the interview room to the holding cell.  They gave [Petitioner] a cup of coffee and a soda, and they processed the paperwork about the case.  No one interviewed or spoke to [Petitioner] during this time.

About 45 to 50 minutes later, the detectives escorted [Petitioner] from the holding cell into their office.  Detective Toscano told [Petitioner] that Reyes did not exist, and that [Petitioner] did things that he blamed Reyes for.  [Petitioner] said yes, that it was true.  The detectives asked [Petitioner] if he was willing to tell the truth and [Petitioner] said yes.

At 3:56 a.m., the detectives escorted [Petitioner] back to the interview room and activated the recording equipment.  Palma testified [Petitioner's] demeanor changed during the second portion of the interview.  [Petitioner] sat up straight, he talked freely, the conversation flowed, and he looked at the detectives as he answered questions.

[Petitioner] admitted he killed Gallegos.  [Petitioner] said Gallegos was driving the Durango and [Petitioner] was in the passenger seat.  [Petitioner] used a silver-plated .357 magnum, and pulled it from his waistband.  He fired one shot into Gallegos's right temple.  The Durango went out of control until [Petitioner] grabbed the steering wheel and reached the gas and brake pedals.

[Petitioner] admitted he burned the Durango, and used Gallegos's "Bic" lighter to ignite a McDonald's bag from the backseat.[8]  [Petitioner] ran away when the vehicle started to burn.  [Petitioner] denied that he planned to kill Gallegos and claimed it occurred to him "all of a sudden."

 [Petitioner] said he threw the gun into a canal after he took Ayala home.  [Petitioner] described the canal where he threw the gun, and said the weapon would have two live rounds and one expended casing. [9]  [Petitioner] did not show the gun to Ayala.

---

[8] Gallegos's wife testified that they had dinner at McDonald's just before Gallegos left to meet [Petitioner].

[9] A dive team from the sheriff's department searched several canals near the crime scene and Ayala's house, and they did not find any weapons.  Palma conceded [Petitioner] could have accurately described the canal's location.  An investigator determined several canals flowed into underground pipes.

[Petitioner] knew Ayala believed they were going to burn a stolen car.  [Petitioner] also knew that Ayala sat in the back seat of [Petitioner's] car because he thought someone was going to leave the field with them.  [Petitioner] admitted he told Ayala that person "was burning over there inside the truck."

[Petitioner] said he decided to kill Gallegos because they argued about the Mitsubishi, and Gallegos treat him as if he were "a snotty kid."  [Petitioner] pulled his weapon and told Gallegos to drive into the field.  Gallegos told [Petitioner] to kill him, so [Petitioner] did.  [Petitioner] claimed he might not have fired if Gallegos had not said that.  [Petitioner] said the gun "discharged" and the shooting may have been an "accident."  [Petitioner] admitted he burned the Durango to "cover up … the evidence."  He saw Gallegos's lighter and it "occurred" to him to burn the vehicle.  [Petitioner] claimed that when he set the fire, Gallegos was bleeding profusely and he was already dead.  [Petitioner] said he did not take Gallegos's watch and jewelry.

[Petitioner] gave contradictory answers as to whether he had the money to pay off the truck.  [Petitioner] initially said he did not have the money, and then said he had the money, but he did not pay Gallegos.

The interview ended at 4:23 a.m.

**ADDITIONAL PROSECUTION EVIDENCE**

Detective Palma testified he tried to determine whether "Reyes Mata Palomino" existed, but could not find any evidence of this person in various state computer records.

At trial, Ayala testified about his interactions with [Petitioner], his observations of the truck nearly flipping over, the smoke from the field, and [Petitioner's] admission that he killed Gallegos and burned the Durango.  Ayala admitted that he initially lied to the officers when he was asked about [Petitioner] and Gallegos, and he was afraid that he would get into trouble because he helped [Petitioner].

Ayala testified that he made a deal with the district attorney that he could not be charged with burning or stealing the car if he gave truthful testimony.[10]

Also at trial, Ayala testified about an incident with [Petitioner's] father that occurred shortly before the trial.  [Petitioner's] father spoke to Ayala about a week before his trial appearance.  [Petitioner's] father told Ayala that it would be better if Ayala "didn't come here" so he would not get himself "into trouble."  Ayala admitted that he failed to mention these statements to anyone prior to his appearance at trial.[11]

---

[10] The prosecution granted Ayala "use immunity" from prosecution, for the act of participating in the disposal of a stolen vehicle, in exchange for his truthful testimony at [Petitioner's] trial.

[11] As we will explain in issue III, *post*, the court instructed the jury about the limited admissibility of Ayala's

**[PETITIONER'S] EVIDENCE**

**[Petitioner's] trial testimony**

[Petitioner], who was 21 years old, testified he was working 10-hour shifts for an agricultural company at the time of his arrest.  On October 20, 2008, after he was interviewed by the detectives, he went to bed around 2:00 a.m.  On October 21, 2008, the day of his arrest, he got up at 4:30 a.m., went to work at 5:45 a.m., and worked until 4:30 p.m.

[Petitioner] testified he did not shoot Gallegos or set his car on fire.  [Petitioner] testified about the events of October 19, 2008, consistent with his statement during the first half of his postarrest interview: Reyes shot and killed Gallegos and burned the Durango, Reyes had asked him to take Gallegos to the field, and [Petitioner] agreed because he thought Reyes and his friends were going to beat up Gallegos.  [Petitioner] admitted he was going to participate in the beating because he was angry at Gallegos about the Mitsubishi truck.

[Petitioner] said he met Reyes earlier the same morning.  Reyes saw [Petitioner] driving the Mitsubishi and recognized it as previously belonging to Gallegos.  Reyes told [Petitioner] that Gallegos owed him money for drugs.  Reyes asked [Petitioner] to bring Gallegos to him, so they could get their anger off their chest by beating up Gallegos.  [Petitioner] told Reyes to meet them at a particular field off Lincoln Avenue.  [Petitioner] called Ayala because he needed a way to get home after he lured Gallegos to the field.  He told Ayala about the plan to beat up someone.  He did not remember asking Ayala to buy a cigarette lighter, but he could have done so.

[Petitioner] testified Ayala dropped him off at a particular location, Gallegos picked him up, and they went to Gallegos's house to pick up the truck's pink slip.  [Petitioner] testified Gallegos drove along Lincoln Avenue, and he got Gallegos to stop in the field by telling him that he had to urinate.  Reyes was following them in a Chevrolet Tahoe SUV.  When they arrived at the vineyard, Reyes got into the back seat of Gallegos's SUV and made Gallegos drive into the field.  Reyes and [Petitioner] got out and stood on the passenger side of the SUV.  Reyes and Gallegos talked, and Reyes shot Gallegos through the open passenger door.

[Petitioner] testified Ayala never asked him about the other guy in the field.  [Petitioner] admitted he later told Ayala that he shot the victim.  He made that false statement so he could gain the respect of the younger kids in the area.  [Petitioner] admitted that he also told Ayala not to tell anyone that he killed Gallegos.  [Petitioner] conceded it was contradictory to do so, but he expected Ayala to have a "big mouth" and tell everyone anyway.

---

testimony about the statements of [Petitioner's] father, that such statements could not be considered as showing [Petitioner's] consciousness of guilt.

12

[Petitioner] testified that during his postarrest interview, he was not afraid of Reyes when he initially told the detectives that Reyes killed Gallegos.  After the break in the interview, however, he said that he became afraid of Reyes and falsely told the detectives that he shot Gallegos because he was "scared" and "traumatized," and he did not want anything to happen to his family.  Just before he was arrested, [Petitioner] learned from his uncle that his aunt, Jeannete Lopez, had been beaten by some men who were looking for [Petitioner].  They "took it out" on his aunt when they could not find him.  [Petitioner] believed Reyes was looking for him and wanted to silence him about what happened to Gallegos.

. . .

(Ex. A to Answer, Opinion at 1-11, footnotes in original.)

### III.

### DISCUSSION

#### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

#### B.    Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

///

13

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254

14

apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Richter, 131 S.Ct. at 784.

## C.    Instructional Error

Petitioner contends that he suffered prejudice by the jury being instructed with CALCRIM No. 334 because it impermissibly limited the definition of an accomplice and allowed the jury to find him guilty by uncorroborated accomplice testimony in violation of California law.  More specifically, Petitioner contends the trial court had a sua sponte duty to broaden the definition of accomplice testimony to include the natural and probable consequences doctrine.

In the last reasoned decision, the California Court of Appeal, Fifth Appellate District found the claim to be without merit stating:

> [Petitioner] next contends Ayala was an accomplice to the charged offense of murder and arson, and the trial court had a sua sponte duty to instruct the jury on the "natural and probable consequences" doctrine of accomplice culpability.  The People assert the jury properly received the pattern cautionary instruction on accomplice testimony, and the trial court did not have a sua sponte duty to expand the accomplice instruction to include the "natural and probable consequences" theory given [Petitioner's] failure to request that language.
>
> A [Petitioner] cannot be convicted of a crime on the basis of an accomplice's testimony unless that testimony is corroborated by other evidence connecting the defendant with the commission of the charged offense.  (§ 1111.)  When there is sufficient evidence that a witness is an accomplice, the trial court has a sua sponte duty to instruct the jury on the general principles governing the law of accomplices, including the need for corroboration.  (CALCRIM No. 334; People v. Frye (1998) 18 Cal.4th 894, 965-966 disapproved on other grounds in People v. Doolin, supra, 45 Cal.4th 390, 421, fn.22; People v. Tobias (2001) 25 Cal.4th 327, 331.)
>
> Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  In order to be chargeable with the identical offense, the witness must be considered a principal under section 31.  [Citation.]  That section defines principles to include '[a]ll persons concerned in the commission of a crime … whether

///

15

they direct commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission….' (§ 31.)"  (People v. Fauber (1992) 2 Cal.4th 792, 833-834.)

A person is generally liable as an aider and abettor if he or she (1) has knowledge of the unlawful purpose of the perpetrator, (2) intends to assist the perpetrator in the commission of the crime, and (3) does assist in the commission of the crime.  (People v. Prettyman (1996) 14 Cal.4th 248, 259 (Prettyman).)

An aider and abettor may also be liable as an accomplice under a '"natural and probable consequences"' theory, which mandates that an aider and abettor is liable for any other crimes that are the natural and probable consequence of the target crime.  (Prettyman, supra, 14 Cal.4th 248, 254.)  The test to determine whether a crime is a natural and probable consequence of the target crime is whether a reasonable person in the alleged abettor's position would or should have known that the charged offense was a reasonably foreseeable consequence of the target crime.  (People v. Nguyen (1993) 21 Cal.App.4th 518, 531.)  To determine whether the ultimate offense was reasonably foreseeable, "all the circumstances leading up to the last act by which a participant directly or indirectly encouraged the principal in the commission of the crime" must be considered.  (Id. at p. 532.)

While a trial court has a sua sponte duty to instruct on the general principles of law regarding accomplices, the court does not have a corresponding sua sponte duty to instruct on the natural and probable consequences of accomplice liability, and about target and nontarget offenses, unless the prosecution relies on that doctrine to prove the defendant's guilt or the defense requests the instructions.  (People v. Avila (2006) 38 Cal.4th 491, 568-569 (Avila); Prettyman, supra, 14 cal.4th at pp. 269-270; People v. Gonzalez (2002) 99 Cal.App.4th 475, 484-485 (Gonzalez).)

As applied to the instant case, the court instructed the jury with CALCRIM No. 334, the pattern instruction for accomplice liability.  This instruction stated that the jury had to decide whether Ayala was an accomplice and subject to prosecution for the identical crimes charged against [Petitioner], an accomplice's testimony must be corroborated, and the supporting evidence may be slight.  [Petitioner] did not object or request modification of the instruction.  The court did not instruct the jury on the "natural and probable consequences" doctrine of accomplice liability, and neither the prosecutor nor [Petitioner] requested such an instruction or relied on that theory of accomplice liability.  As such, the court did not have a sua sponte duty to instruct on the natural and probable consequences theory of accomplices.

[Petitioner] concedes that CALCRIM No. 334, as given to the jury, correctly defined the general rule to consider whether a witness was an accomplice.  [Petitioner] further concedes he did not object to CALCRIM No. 334.  However, [Petitioner] argues the pattern instruction was "under-inclusive" because it failed to include the broader

///

///

16

definition of accomplice culpability based upon the natural and probable consequences doctrine, which would have allowed the jury to find Ayala was an accomplice and that his testimony was subject to corroboration.

. . .

(Ex. A, Answer, Opinion at 21-24.)

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Habeas corpus relief is only available if the instructional error implicates the fundamental fairness of a trial in violation of due process or infringes upon an enumerated federal constitutional right. Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009).  A petitioner's burden is especially heavy when a claim is based on the omission of an instruction because no erroneous instruction was given.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.  Id.  The significance of the omitted instruction is evaluated by a comparison with the instructions that were given.  Id. at 156; Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir.2001).

In light of the appellate court's interpretation of state law, to which this court must defer, and the plain fact that the prosecution did not rely on the "natural and probable consequences doctrine" in considering whether Ayala was an accomplice, Petitioner has failed a due process violation because there was no duty on the part of the trial court to give a further instruction. Furthermore, Petitioner's claim that Ayala's testimony was not corroborated does not give rise to a federal constitutional violation.  "The Fourteenth Amendment does not forbid a state court to construe and apply its law with respect to the evidence of an accomplice.  Lisenba v. California, 314 U.S. 219, 227 (1941).  Although California Penal Code section 1111 provides that a conviction cannot be sustained upon the testimony of an accomplice unless it is corroborated, there is no constitutional mandate requiring accomplice testimony to be corroborated.  United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."); Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) ("[a]s a state statutory rule,

1    and to the extent that the uncorroborated testimony is not 'incredible or substantial on its face,'

2    [Section 1111] is not required by the Constitution or federal law.").  Accordingly, this claim is

3    without merit and should be dismissed.

4        **D.    Miranda Violation**

5        Petitioner contends the trial court erroneously admitted Petitioner's confession despite his

6    objection that his confession was involuntary.

7        The Court of Appeal rejected Petitioner's claim on direct appeal in the last reasoned

8    decision stating:

9
   > [Petitioner] contends the trial court should have granted his motion to exclude the
10 > statements he made during his postarrest interview with Detectives Palma and Toscano,
   > when he initially claimed "Reyes" killed Gallegos, and then admitted that he shot
11 > Gallegos and set the victim's car on fire.  [Petitioner] asserts all of his postarrest
   > statements were involuntary because of comments made by Palma immediately before
12 > Palma read the <u>Miranda</u> warnings to him—that it was important to tell the truth about
   > what happened to Gallegos and express remorse.  [Petitioner] argues that even though
13 > Palma followed this statement by reading the <u>Miranda</u> advisements, [Petitioner] received
   > contradictory information as to whether he had the right to remain silent or he had to
14 > answer the detectives' questions.  [Petitioner] further argues Palma failed to obtain an
   > express waiver of his constitutional rights, and any implied waiver was involuntary
15 > because [Petitioner] was extremely fatigued when he was arrested and interviewed, and he
   > was confused by Palma's admonishments to tell the truth.
16
17 > The court conducted a pretrial evidentiary hearing as to whether [Petitioner's] postarrest
   > statements were voluntary.  The only witnesses were Detective Palma and [Petitioner].
18
19 > We will review well-settled principles of voluntariness, and then turn to the testimony at
   > the evidentiary hearing and the court's ruling to determine whether [Petitioner's]
20 > postarrest statements were voluntary and properly admitted.
21
   > . . .
22
   > **B. Detective Palma's hearing testimony**
23
24 > At the evidentiary hearing, Detective Palma testified that at 8:05 p.m. on Monday,
   > October 20, 2008, [Petitioner] was interviewed at the sheriff's department substation in
25 > San Joaquin.  [Petitioner] was not under arrest.  During this interview, [Petitioner]
   > repeatedly said he did not know what happened to Gallegos, and he last saw Gallegos
26 > driving off with "Bocho."  The interview ended at 11:10 p.m.  [Petitioner] was allowed to
   > leave and the detectives drove him to his residence in Raisin City.
27

28   ///

Palma testified [Petitioner] was arrested at 10:40 p.m. on Tuesday, October 21, 2008, at the trailer where he lived in Raisin City.  [Petitioner] was watching television when the detectives arrived.  Palma advised [Petitioner] he was under arrest and placed him in handcuffs.  [Petitioner] did not resist.  The officers did not draw their weapons when they arrested [Petitioner].  A deputy transported [Petitioner] to the sheriff's department in Fresno, and [Petitioner] was taken to a holding cell.

At 1:25 a.m. on Wednesday, October 22, 2008, [Petitioner] was escorted into an interview room by Detectives Palma and Toscano.  The interview room's door was closed but not locked.  [Petitioner] was under arrest but he was not in handcuffs or restraints.  The interview was videotaped.  The detectives were in plain clothes.  They were armed but did not display their weapons.  This was the first time that [Petitioner] was interviewed after his arrest.

According to the transcript, Palma began the interview by confirming [Petitioner's] name, address, and birthday.  Palma then made the following statements to [Petitioner] before he read the <u>Miranda</u> warnings:

"[Palma].  Okay, what I explained in the recording is that we contacted you at your address….  We arrested you and we brought you here and right now we're at Fresno Sheriff's Headquarters and we're in Interview Room # 156, okay?  Because you are under arrest I am going to read you your Rights, okay?  It's important that now you are under arrest, now it is really true, right?

"A.  Yes.

"[Palma].  It's important for you to be honest and tell the truth.  We've already had an interview before today, okay, and you told us—part of what you told was true, but there is more lacking.  It's important for you to show remorse about what happened and explain exactly how things happened.  And if you have an explanation about why what happened, if you were provoked or if it was in self-defense or anything like that, it is important for you to tell us now, okay?  I'm going to read you your Rights, if you have any questions… if you don't understand any of these Rights, I will explain it to you.

"A.  *Yes*."  (Italics added.)

Palma gave [Petitioner] the <u>Miranda</u> warnings in Spanish.  Palma asked [Petitioner] if he understood his rights and [Petitioner] said yes.  Palma did not hear [Petitioner's] reply and again asked him to clarify whether he understood.  [Petitioner] again said yes.  Palma did not ask [Petitioner] if he agreed to waive his rights.  Instead, Palma started asking [Petitioner] a series of questions and [Petitioner] answered the questions.

During the first part of the interview [Petitioner] claimed he lured Gallegos to the field at the request of "Reyes," Reyes shot and killed Gallegos, and Reyes set Gallegos's car on fire.  Detective Palma testified he doubted [Petitioner's] story, but he used a conversational tone of voice and never yelled or screamed at him.  The detectives repeatedly advised [Petitioner] that they did not believe him, and asked him to tell the truth.

19

Detective Palma testified [Petitioner] was "wide awake" during the interview, and his demeanor seemed the same as when he was arrested a few hours earlier.

"He was very thoughtful. [W]hen we were talking to him, he kept putting his head down. He kept avoiding eye contact with us. He kept looking away. When we would ask him certain questions… or we would confront him that he's the one who did this, he would look down. [M]any times he would burry [sic] his head in between his arms in this manner. [¶] Many times I had to or we had to access him to look up, face us, which he would reluctantly do."

Palma testified [Petitioner] never appeared to be tired when he put his head down. [Petitioner] never said he was tired or asked to stop the interview. Palma was aware that [Petitioner] worked long hours in the fields. He did not ask [Petitioner] if he had worked that day or how many hours he had been awake.

At 3:00 a.m., the detectives took a break, and they escorted [Petitioner] from the interview room to the holding cell because the room was not secure. [Petitioner] was not placed in handcuffs or restraints. They gave him a cup of coffee and a soda. The detectives went to their office and processed paperwork. No one talked to [Petitioner] while he was in the holding cell.

At 3:56 a.m. Detectives Palma and Toscano escorted [Petitioner] into their office and intended to book him into custody. Palma sat at his desk, and Toscano and [Petitioner] stood next to the desk. They had left the hand-held tape recorder in the interview room, and their discussion in the office was not tape-recorded.

Palma testified that Toscano advised [Petitioner] they did not believe his story about Reyes and this was his last opportunity to be honest and tell the truth. Toscano told [Petitioner] that Reyes did not exist and [Petitioner] said yes. Palma testified:

"We brought him into our office and basically told him, look, there is no Reyes; right? And he says no. You are Reyes? He says yes. Are you willing to talk to us and tell us your story now? He agreed to it. He said yes. And we went into the interview room and continued with the interview."

Palma testified they escorted [Petitioner] back to the same interview room and activated the recording equipment. They did not re-advise [Petitioner] of the <u>Miranda</u> warnings. Palma asked [Petitioner]: "[N]ow let's talk, explain." [Petitioner] admitted he shot Gallegos and set the car on fire, and also admitted he made up the story about Reyes.

At 4:23 a.m., the second half of the interview ended. Toscano and Palma walked out of the interview room, and [Petitioner] got up and followed them. [Petitioner] was booked into custody and placed in handcuffs.

///

///

**C. [Petitioner's] hearing testimony**

20

At the evidentiary hearing, [Petitioner] testified he was 20 years old when he was arrested. He worked 10-hour    shifts loading pipes for an agricultural company.  He went to bed at 11:00 p.m. on the night before he was arrested, and he got up at 5:00 a.m. the next morning.  He usually slept eight or nine hours a night.  He was awake and watching television on the night he was arrested.

[Petitioner] testified he was placed in a patrol car and slept for about five or six minutes. He was taken to the sheriff's department and placed in a holding cell.  He was tired but he did not sleep in the holding cell because he was "just thinking and thinking" about what the detectives were asking him, and what he had told them.

 [Petitioner] testified that when the detectives began the interview and asked questions, he was "[m]ore or less" awake.  [Petitioner] further testified he was wide awake during the entire interview, including both before and after the break, but he felt like going to sleep.

On cross-examination, [Petitioner] testified that he remembered when Detective Palma advised him of his right to an attorney and to remain silent.  He remembered that Palma asked if he understood his rights, and he said yes.  He remembered that Palma offered to explain his rights if he did not understand.  [Petitioner] testified he never asked for an explanation because he understood his rights.

. . .

**F. Defendant's prearrest statements were voluntary**

[Petitioner] raises several arguments in support of his underlying contention that his postarrest statements were involuntary and should have been excluded.  As we will explain, these arguments are without merit.

We first note when [Petitioner] was initially interviewed on the evening of October 20, 2008, he was not subject to custodial interrogation.  He was not under arrest and he voluntarily agreed to accompany the detectives to the sheriff's substation and answer questions.  [Petitioner's] prearrest statements—that he did not know what happened to Gallegos, and Gallegos drove off with "Bocho"—were not involuntary or the result of any coercive interview techniques.  [Petitioner] was repeatedly advised that he was not under arrest and he was free to leave, he voluntarily agreed to answer questions, he remained outside the substation and stayed by himself during the break, and he voluntarily returned for the second half of his prearrest interview.  While the detectives repeatedly told [Petitioner] that they did not believe his story and urged him to tell the truth, these statements were not coercive and did not represent coercive interview techniques or improper promises.  (People v. Belmontes, supra, 45 Cal.3d 744, 773.)  [Petitioner] was not arrested after this interview and he returned to his residence.  [Petitioner's] prearrest statements were voluntary and admissible.

**G.  Palma's pre-Miranda statements were not coercive**

[Petitioner] asserts that at the beginning of his postarrest interview, Palma improperly

made preliminary statements that it was important to tell the truth about what happened to Gallegos, these statements effectively nullified the impact of the subsequent <u>Miranda</u> advisement that he had the right to remain silent, and rendered all of his postarrest statements involuntary and inadmissible.

[Petitioner's] arguments are based on <u>United States v. San Juan-Cruz</u> (9th Cir. 2002) 314 F.3d 384 (<u>San Juan-Cruz</u>), in which the court found the defendant received conflicting advisements on whether he had the right to counsel.  In <u>San Juan-Cruz</u>, defendant had been deported by the Immigration and Naturalization Service.  Thereafter, he was apprehended by the Border Patrol for illegally attempting to reenter the country.  A Border Patrol agent advised defendant of his administrative rights, including that he had the right to have counsel present during questioning but not at the government's expense.  The agent then informed defendant that he faced criminal charges and advised him of the <u>Miranda</u> warnings, that he had the right to remain silent and the right to an attorney, and an attorney would be appointed if he could not afford one.  Thereafter, defendant admitted he illegally entered the country.  He was indicted for illegally attempting to reenter the country after being deported.  (<u>San Juan-Cruz</u>, <u>supra</u>, at pp. 386-387.)

<u>San Juan-Cruz</u> held the agent improperly gave defendant "two different and conflicting sets of warnings," when he was advised of his administrative right to an attorney but not at government expense, and then advised pursuant to <u>Miranda</u> that he had the right to an attorney and one would be appointed to represent him if he could not afford attorney. (<u>San Juan-Cruz</u>, <u>supra</u>, 314 F.3d at p. 388.)  The court held "these two conflicting sets of instructions were read to him one after another and, as a result, their meaning became unclear."  (<u>Ibid.</u>)

"When one is told clearly that he or she does not have the right to a lawyer free of cost and then subsequently advised, '[i]f you can't afford a lawyer, one will be appointed for you,' it is confusing.  Requiring someone to sort out such confusion is an unfair burden to impose on an individual already placed in a position that is inherently stressful."  (<u>Ibid.</u>)

<u>San Juan-Cruz</u> concluded defendant could not "reasonably ascertain" whether "he could or could not retain the services of an attorney for free," because the agent failed to "convey clearly" that he had the right to have an attorney present prior to and during questioning.  (<u>San Juan-Cruz</u>, <u>supra</u>, 314 F.3d at p. 388.)

. . .

[Petitioner] relies on <u>San Juan-Cruz</u> and argues Palma's pre-<u>Miranda</u> statements amounted to a "threatening disclaimer" that it was important to tell the truth, show remorse, and explain what happened, and contradicted the subsequent <u>Miranda</u> advisement that he had the right to remain silent, and the entirety of his postarrest statements were voluntary.

[Petitioner's] argument lacks merit.  In contrast to <u>San Juan-Cruz</u>, Palma did not read [Petitioner] two sets of advisements, and he did not engage in any inappropriate or coercive interview techniques when he asked [Petitioner] to tell the truth.  "Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth.  [Citations.]"  (<u>People v. Williams</u> (2010) 49 Cal.4th 405, 444.)

22

"As has been reiterated, 'mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.' [Citation.]  In terms of assessing inducements assertedly offered to a suspect, "'[w]hen the benefit pointed out by the police…is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.]' [Citation.]" (People v. Howard (1988) 44 Cal.3d 375, 398; Holloway, supra, 33 Cal.4th at p. 115.)

In addition, any suggestions made by the interrogating officers "that defendant may not have been the actual killer, or may not have intended that the victim die," are not coercive. (People v. Williams, supra, 49 Cal.4th at p. 444.)  It is permissible for the officers to suggest "possible explanations of the events" and offer defendant "an opportunity to provide the details of the crime.  This tactic is permissible. [Citation.]" (People v. Carrington (2009) 47 Cal.4th 145, 171.)  . . .

Palma's pre-Miranda statements to [Petitioner]—that it was important to tell the truth, show remorse, and explain what happened—were not coercive, and were not accompanied by any threats, promises or inducements to make [Petitioner] believe that he had no choice but to answer their questions.  In contrast to the Border Patrol agent in San Juan-Cruz, Palma did not deliver contradictory advisements or admonish [Petitioner] that he had to answer questions.  Palma did not promise lenient treatment in exchange for cooperation, or represent that the court or prosecutor would grant [Petitioner] any particular benefit if he told them what happened.  (See, e.g., Holloway, supra, 33 Cal.4th at p. 116.)

Palma immediately advised [Petitioner] of his right to remain silent, thus impressing upon [Petitioner] the fact that while it was important to tell the truth, he had the right not to answer any of their questions.  At the evidentiary hearing, [Petitioner] testified that he remembered being advised of his rights, particularly the right to remain silent, and he never asked Palma for an explanation because he understood his rights.  Palma's pre-Miranda statements did not render [Petitioner's] statements involuntary.

**H. Waiver**

[Petitioner] additionally contends that even if Detective Palma properly advised him of the Miranda warnings, Palma failed to obtain an express waiver of rights from [Petitioner].  [Petitioner] argues any implied waiver was involuntary because [Petitioner] was confused by Palma's pre-Miranda exhortation to tell the truth.

. . .

As we have explained, Palma's pre-Miranda statements to [Petitioner], that it was important to tell the truth, were not coercive, Palma properly advised [Petitioner] of the Miranda warnings and twice asked [Petitioner] if he understood his rights.  [Petitioner] said yes.  Palma did not expressly ask [Petitioner] if he wanted to waive his rights and answer questions.  Instead, Palma asked [Petitioner] about his contacts with Gallegos, and [Petitioner] immediately began answering questions with his story about Reyes.

[Petitioner] never said that he did not understand his rights, and [Petitioner] testified at the evidentiary hearing that he did not ask Palma to explain his rights because he understood them. [Petitioner] never asked for an attorney or refused to answer questions. There is no evidence that Palma badgered [Petitioner] into waiving his rights. (See, e.g., <u>People v. Davis</u> (2009) 46 Cal.4th 539, 590; <u>Neal</u>, <u>supra</u>, 31 Cal.4th at p. 80.)

Indeed, while [Petitioner] apparently did not have prior experiences in criminal cases, the interrogation showed that [Petitioner] was "'attempting to use the interview as much as the officers.'" (<u>Holloway</u>, <u>supra</u>, 33 Cal.4th at p. 116.) Once the detectives advised [Petitioner] about their conversation with Ayala, [Petitioner] abandoned his claim that Gallegos was last seen discussing drug deals with "Bocho." [Petitioner] eagerly changed his story to the assertion that "Reyes" asked him to "lure" Gallegos to the vineyard so "Reyes" could settle the dispute about a drug debt. [Petitioner's] eagerness to tell the story about "Reyes" demonstrated his implied waiver of the right to remain silent.

**I. Fatigue**

 [Petitioner] contends that he was too exhausted from his long workday to knowingly and intelligently waive his rights during the postarrest interview. The circumstances of the [Petitioner's] arrest and interrogation refute his argument. [Petitioner] was awake and watching television when the deputies arrived at his residence to arrest him at 10:40 p.m. on October 22, 2008. Detective Palma testified [Petitioner] was awake when he was arrested, and [Petitioner] displayed the same demeanor during the entirety of the postarrest interview. While [Petitioner] layed his head down on the interview table, Palma testified he seemed to be thinking about his responses to the detectives questions about whether he was involved in Gallego's murder.

At the evidentiary hearing, [Petitioner] testified about his long work hours and that he slept a little in the patrol car immediately after he was taken into custody. [Petitioner] testified he did not sleep in the holding cell at the sheriff's department, prior to the postarrest interview, because he was thinking about his situation. [Petitioner] further testified he was wide awake during the entire postarrest interview, including both before and after the break, even though he felt like going to sleep.

Defense counsel conceded at the evidentiary hearing that while he intended to argue [Petitioner] was too sleep deprived to waive his rights, the "sleep deprivation evidence did not come in as I had hoped and expected it would, and that ground has really been damaged" by [Petitioner's] hearing testimony. There is no evidence that the questioning, or that such fatigue occurred or played any role in [Petitioner's] decision to confess. [Citation.]" (<u>People v. Rundle</u> (2008) 43 Cal.4th 76, 123, disapproved on other grounds in <u>People v. Doolin</u>, <u>supra</u>, 45 Cal.4th 390, 4221, fn.22.)

**J. Deception**

During the first part of the postarrest interview, Palma falsely told [Petitioner] that they found shoe prints at the crime scene. However, the use of deception comments does not necessarily render a statement involuntary unless the deception is of the type reasonably likely to procure an untrue statement. (<u>People v. Jones</u> (1998) 17 Cal.4th 279, 299.) "The

24

courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.  [Citations.]"  (People v. Ray, supra, 13 Cal.4th 313, 340; see, e.g., People v. Farnam (2002) 28 Cal.4th 107, 182 [officer's false statement that defendant's fingerprints were found on victim's property was not the type of deception likely to produce false confession]; People v. Thompson (1990) 50 Cal.3d 134, 166-167 [defendant's statements admissible even though police falsely said that incriminating evidence had been found].)

Palma's false advisement about shoe prints was not so coercive that it rendered [Petitioner's] subsequent statements as involuntary.  [Petitioner] did not display any signs of distress when Palma made this statement, he "remained able to parry the officers' questions" with his continued story about "Reyes" killing Gallegos, and he did not incriminate himself as a result of the remarks.  (See, e.g., People v. Williams, supra, 49 Cal.4th at p. 443.)

**K. Failure to readvise [Petitioner] of Miranda warnings**

We further note the detectives were not required to readvise [Petitioner] of the Miranda warnings after the 56-minute break between the first and second parts of the postarrest interview.  "[A] Miranda readvisement is not necessary before a custodial interrogation is resumed, so long as the proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' [Citations.]"  (People v. Smith (2007) 40 Cal.4th 483, 504.)  In determining whether a subsequent interrogation is "reasonably contemporaneous" with a prior Miranda waiver, "[t]he courts examined the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights.  [Citations.]"  (People v. Mickle (1991) 54 Cal.3d 140, 170-171 [readvisement unnecessary when defendant twice received and twice waived his Miranda rights 36 hours before interrogation resumed]; see also People v. Lewis (2001) 26 Cal.4th 334, 386-387 [five-hour lapse of time since prior advisement]; People v. Smith, supra, 40 Cal.4th at pp. 504-505 [less than 12 hours since prior advisement]; People v. Stallworth (2008) 164 Cal.App.4th 1079, 1089 [16 hours].)

As applied in this case, the detectives were not required to re-advise [Petitioner] of the Miranda warnings, just 56 minutes after the initial advisement and implied waiver. [Petitioner] was not questioned during the break, and he was interviewed by the same detectives who had previously advised him of his constitutional rights.

We thus conclude that [Petitioner's] postarrest statements were voluntary, he was not subject to two contradictory sets of advisements, his implied waiver was knowing and intelligent, and the court properly admitted the entirety of his postarrest statements.

(Ex. A to Answer, Opinion at 11-21.)

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court held that "the

prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  As to the procedural safeguards to be employed, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Id.  With respect to custodial interrogation, the Supreme Court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease."  Id. at 473-474.

The determination of whether a suspect is "in custody" for purposes of Miranda requires application of an objective test.  The court considers the following two factors in determining whether the suspect was in custody: 1) what were the overall circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person in the suspect's situation have felt free to terminate the interrogation and leave.  J.D.B. v. North Carolina, __ U.S. __, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011).

The ultimate inquiry this court must determine is whether the state appellate court applied Miranda objectively unreasonable in finding that Petitioner's statements did not violate Miranda.  In Yarborough v. Alvarado, the Supreme Court reiterated the standard to determine whether the state court decision was objective unreasonable stating:

> The term "'unreasonable'" is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." (citation omitted.)  At the same time, the range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

541 U.S. 652, 663 (2004).

1          1.      Pre-arrest Statements

2          As to the prearrest statements, the determination by the appellate court that Petitioner was

3   not "in custody" was not objectively unreasonable.  Petitioner voluntary went to the police station

4   and denied any wrongdoing.  Petitioner was repeatedly told that he was free to leave and, on one

5   occasion, exited the building for a break and voluntarily returned for further questioning.  (ACT

6   13-15, 94.)  The fact that the officers told Petitioner that they did not believe his story and

7   encouraged him to tell the truth did not amount to coercion.  See Amaya-Ruiz v. Stewart, 121

8   F.3d 486, 494 (9th Cir. 1997) ("Encouraging [defendant] to tell the truth also did not amount to

9   coercion."); United States v. June, 312 Fed.Appx. 990, 991 (9th Cir. 2009) ("A police officer's

10  repeated exhortations to tell the truth do not amount to coercion.").  In this instance, a reasonable

11  person under these circumstances would have understood that he was not under arrest and was, in

12  fact, free to leave.  Indeed, Petitioner was not arrested after the interview and he returned to his

13  residence.  Accordingly, there is no merit to Petitioner's claim that he was "in custody" at the

14  time of his pre-arrest statements.

15         2.      Pre-Miranda Statements Not Coercive

16         Petitioner also contends his pre-Miranda statements were inadmissible because prior to

17  advising him officer Palma told Petitioner it was important for him to tell the truth which in effect

18  nullified the subsequent Miranda warnings.  As previously stated, the fact that an officer

19  recommends that the suspect tell the truth does not rise to the level of coercion absent any

20  improper threats or promises.   Petitioner specifically acknowledged that detective Palma told him

21  if he did not understand any of the rights explained to him he would explain them to Petitioner.

22  (RT 94-95.)  Petitioner further acknowledged that he never told detective Palma that he did not

23  understand the rights explained to him.  (RT 95.)  The statements preceding the Miranda warnings

24  to tell the truth and show remorse did not cast a cloud on the Miranda warnings subsequently

25  given that Petitioner admitted having understood.  Thus, the state court's determination of this

26  issue was not contrary to, or an unreasonable application of Miranda.

27         3.      Waiver of Rights Under Miranda

28         Petitioner further contends that even if detective Palma properly advised him of the

27

<u>Miranda</u> warnings, he failed to obtain an express waiver of rights from Petitioner.

Under clearly established federal law, a valid <u>Miranda</u> waiver may be express or implied.  In

<u>Miranda</u>, the Supreme Court held that "'[t]he defendant may waive effectuation' of the rights

conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and

intelligently.'" <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (quoting <u>Miranda</u>, 384 U.S. at 444,

475.)  There are two parts to the inquiry.  <u>Edwards v. Arizona</u>, 451 U.S. 477, 482 (1981).  "First,

the relinquishment of the right must have been voluntary in the sense that it was the product of a

free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver

must have been made with a full awareness of both the nature of the right being abandoned and

the consequences of the decision to abandon it." <u>Moran</u>, 475 U.S. at 421.  "Only if the 'totality of

the circumstances surrounding the interrogation' reveal both an uncoerced choice and the

requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been

waived." <u>Id.</u> (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979)); <u>see also</u> <u>North Carolina v.</u>

<u>Butler</u>, 441 U.S. 369, 374-375 (1979).

As in this instance, a suspect may be found to have waived the <u>Miranda</u> rights by

answering the officer's questions after receiving Miranda warnings.  <u>Terrovona v. Kincheloe</u>, 912

F.2d 1176, 1179, 1180 (9th Cir. 1990).  Therefore, the question of waiver must be determined on

the "particular facts and circumstances surrounding that case, including the background,

experience, and conduct of the accused." <u>North Carolina v. Butler</u>, 441 U.S. 369, 374-375

(1979).

This Court has read the transcript of Petitioner's interrogation and hearing of the motion

to exclude his statements and agrees with the conclusions reached by the California Court of

Appeal.  Although there was no express waiver of the <u>Miranda</u> rights, the record clearly supports

the finding that there was an implied waiver which was constitutionally effective.  Petitioner

acknowledged that he understood his rights twice and proceeded to speak with detective Palma

thereafter.  (ACT 153-154.)  Petitioner's acknowledgment of having been advised of his <u>Miranda</u>

rights and willingness to continue to answer questions thereafter militate against a finding of

coercion.  Accordingly, based on these circumstances, Petitioner's impliedly waived his <u>Miranda</u>

28

rights, the state court's determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

       4.    <u>Fatigue</u>

      Petitioner contends that he was too exhausted from his long workday to knowingly and intelligently waive his rights during the postarrest interview.  Petitioner indicated that he was awake during the entire interrogation and answered all of the questions posed to him.  Petitioner never complained of fatigue or otherwise indicated that he was too tired to continue the interview.  Cf. <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1080 (9th Cir. 2000) (counsel not ineffective for failing to challenge waiver of <u>Miranda</u> rights as involuntary based on defendant's drug use, fatigue and mental deficiencies where evidence demonstrated defendant's awareness of rights and willingness to speak with police.)  Thus, the record demonstrates that Petitioner was fully aware of the nature of his rights and the consequences of his decision to waive those rights.   Given these circumstances, Petitioner cannot in hindsight argue that he was too fatigued to continue with the interview rendering his waiver ineffective.   Accordingly, there is no merit to Petitioner's claim.

       5.    <u>Deception</u>

      Petitioner contends his statements were involuntary because detective Palma falsely told him they found shoe prints at the scene of the crime.  Deception by police does not render a confession involuntary unless the conduct caused the suspect to make the statement.  <u>United States v. Miller</u>, 984 F.2d 1028, 1031 (9th Cir. 1993); <u>Amaya-Ruiz v. Stewart</u>, 121 F.3d 486, 495 (9th Cir. 1997).  Here, after detective Palma falsely told Petitioner that they obtained shoe prints from the crime scene, Petitioner continued to deny the allegations and make the false allegation that a Reyes Mata-Palomino shot the victim. (ACT 193-195.)  Accordingly, the statement did not prompt Petitioner to make any guilty statements.  Furthermore, the Supreme Court has specifically held that this type of deception does not rise to coercive conduct.  <u>See e.g.</u>, <u>Frazier v. Cupp</u>, 394 U.S. 731, 737-739 (1969) (holding that confession was voluntary even though the officer falsely told the suspect that his co-conspirator had confessed to the crime).

//

6.     Failure to Re-advise of Miranda Warnings

Finally, the appellate court reasonably found that the 56 minute break between the two post-arrest interrogation sessions did not require the detective to re-advise Petitioner of his Miranda rights.   Miranda re-advisement is not required "simply because there is a break in questioning," where the suspect was previously properly advised and had waived his Miranda rights.  People v. Dela Pena, 72 F.3d 767, 769-770 (9th Cir. 1995); see also United States v. Rodriguez-Preciado, 399 F.3d 1118, 1130 (9th Cir. 2005) ("[F]ailure to re-administer warnings on the second day does not automatically render any of the statements made that day inadmissible.").  As explained above, detective Palma advised Petitioner of his Miranda rights, which he properly waived.  The circumstances did not seriously change during the short 56-minute break.  See Wyrick v. Fields, 459 U.S. 42, 47 (1982).  Indeed, the Ninth Circuit has held much longer periods of breaks did not require re-advisement of the Miranda warning.  See e.g., Maguire v. United States, 396 F.2d 327, 331 (9th Cir. 1968) (adequate Miranda warnings given three days before second officer interrogated defendant; court held "even if the warning given by [the second officer] was insufficient, the [defendant] could not claim he had not been apprised of the Miranda warnings"); Puplampu v. United States, 422 F.2d 870 (9th Cir. 1970) (per curiam) (statements admissible when defendant had been fully advised of Miranda rights two days earlier).  Accordingly, the appellate court reasonably found that Petitioner's confession was admissible at trial, and there is no merit to Petitioner's claim.

**IV.**

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     The instant petition for writ of habeas corpus be DENIED; and

2.     The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and

serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __July 13, 2013__

_____
UNITED STATES MAGISTRATE JUDGE

31